IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

January 22, 2026

LAURA A. AUSTIN, CLERK
BY: /s/ Erica Jones
DEPUTY CLERK

TOBIE L. McPHAIL,               )
                                )
        Plaintiff,              )
                                )    Case No. 7:25-cv-242
                                )
v.                              )    By:    Michael F. Urbanski
                                )    Senior United States District Judge
ROANOKE COUNTY SCHOOL           )
BOARD, et al.,                  )
                                )
        Defendants.

## MEMORANDUM OPINION

This matter is before the court on defendants' Roanoke County School Board ("School Board"), April Brubaker, Stephanie Hogan, Brent Hudson, Jessica McClung, Kenneth Nicely, and Timothy Greenway (collectively "defendants"), motion to dismiss plaintiff Tobie L. McPhail's complaint for failure to state a claim and lack of subject matter jurisdiction. ECF No. 19. The court previously denied defendants' motion to dismiss Counts I, II, III, VII, VIII, IX, and X against the School Board. The court now **DENIES** defendants' motion to dismiss Counts VII, VIII, IX, X, and XIV against Brubaker, Hogan, Hudson, McClung, and Greenway. The court **GRANTS** defendant Nicely's motion to dismiss Counts VII, VIII, IX, X, and XIV. The court also **GRANTS** defendants' motion to dismiss for failure to state a claim as to Counts XI, XII, and XIII against all defendants and **GRANTS** defendants' motion to dismiss for lack of subject matter jurisdiction as to Counts IV, V, and VI.

## I.    BACKGROUND

Plaintiff Tobie L. McPhail worked for 23 years in Roanoke County Public Schools, most recently as Assistant Principal at Glen Cove Elementary School ("GCES"). Compl., ECF

1

No. 1 ¶¶ 1, 6. McPhail "is cisgender and heterosexual" but "she is well-known throughout the Roanoke community, including throughout Roanoke County Public Schools, as an advocate for the LGBTQ+ community." Id. ¶ 6. Specifically, McPhail has shown her support for the LGBTQ+ community by "decorating her office with colorful items and welcoming messages; wearing bright, colorful, and cheery clothing; using a lanyard to hold her required employee identification badge displaying the message 'Love is Love'; and wearing T-shirts displaying the message 'Love is Love.'" Id. ¶ 20. McPhail alleges that prior to the 2022-2023 school year, her "clothes, lanyard, room decorations, association with and advocacy for [the] LGBTQ+ community, and creation of a safe space for all employees and students were appreciated and applauded by administration, staff, and students at GCES." Id. ¶ 21.

Defendant April Brubaker became principal at GCES during the 2022-2023 school year. Id. ¶ 22. McPhail alleges that Principal Brubaker made her "opposition to the LGBTQ+ community (and those who support them) clear" and that it became apparent once Brubaker was in charge that her "discriminatory views were shared by other administrators, including Assistant Superintendent Jessica McClung and Director of Elementary Education Stephanie Hogan, as well as several members of the Roanoke County School Board." Id. ¶ 2. Specifically, Brubaker sought to remove LGBTQ+-friendly symbols from the school, such as rainbow imagery and messages that "hate has no home here." Id. ¶ 3. McPhail alleges that she was demoted and reassigned to a lower paying teaching position due to her continuing attempt to make the school welcoming for LGBTQ+ students and staff. Id. ¶ 4. McPhail resigned rather than accept her demotion, and she has since been able to find a job as a teacher, rather than as an administrator, with Arlington County Public Schools in Arlington, Virginia. Id. This

change in employment has caused McPhail and her family economic harm and other damages. Id. McPhail brings claims under Title VII of the Civil Rights Act of 1964, the Virginia Human Rights Act ("VHRA"), the First Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, Article I, Sections 11 and 12 of the Virginia Constitution, and other state law claims.

Defendants include the Roanoke County School Board; Brent Hudson, the Chairman of the School Board, in his individual capacity; Tim Greenway, a member of the School Board, in his individual capacity; Dr. Ken Nicely, the Superintendent of Roanoke County Public Schools and an employee of the School Board in a supervisory role, in his individual capacity; Dr. Jessica McClung, the Assistant Superintendent of Student Services and Human Resources for Roanoke County Public Schools and an employee of the School Board in a supervisory role, in her individual capacity; Stephanie Hogan, the Executive Director for Elementary Education at Roanoke County Public Schools and an employee of the School Board in a supervisory role, in her individual capacity; and April Brubaker, the Principal of GCES and an employee of the School Board in a supervisory role, in her individual capacity. Id. ¶¶ 7-13.

While McPhail was employed with Roanoke County Public Schools ("RCPS"), the School Board had no written policies regarding employees' display of personal items in their classrooms or offices and had no written policy on employees' apparel or dress. Id. ¶¶ 18-19. In a meeting for administrators that took place in August 2022, before the school year began, "it was suggested that LGBTQ+ teachers or staff members should avoid displaying a photo of their same sex spouse." Id. at 23. McPhail alleges that at this meeting, she "defended the

rights" of LGBTQ+ teachers and staff, making Brubaker appear "visibly uncomfortable" as a result of McPhail's "advocacy." Id. ¶ 23.

Brubaker implemented a new dress policy during the 2022-2023 school year, including "two weekly 'jeans days.'" Id. ¶ 24. On Wednesdays, faculty and staff were encouraged to wear a staff shirt "with the slogan 'BElieve THEre is GOOD'" and on Fridays, faculty and staff could choose what to pair with their jeans. Id.

Around November 4, 2022, Brubaker met with McPhail to inform her "that a parent had complained about the 'message' of Ms. McPhail's 'Love is Love' lanyard" but did not disclose the parent's name. Id. ¶ 26. During this interaction, Brubaker instructed McPhail to remove the lanyard. Id. McPhail responded by telling Brubaker that "she would be contacting her Roanoke County Education Association representative[1] for guidance." Id. ¶ 27. McPhail also alleges that she repeated this statement to McClung and Hogan. Id.

After this meeting and "unbeknownst to Ms. McPhail at the time," Brubaker and Hogan discussed McPhail's lanyard and McPhail's views that "being asked not to wear it is wrong because it does not violate dress code." Id. ¶ 29. Brubaker indicated that she discussed the lanyard and rainbow items with McClung as well. Id. ¶ 30. McClung allegedly asked Brubaker to locate a particular Facebook post that McPhail had commented on. Id. ¶ 31. Brubaker found it and sent a screenshot of the post and McPhail's comments back to McClung. Id. According to McPhail, "the substance of the post was anti-hate and pro-love,"

---

[1] The Roanoke County Education Association representative, Dorothy Carter, appears to act as a union representative for the teachers.

and McPhail's comment repeated one of the quotes from the original post: "I will not play with the bullies." Id.

Brubaker also reported to McClung that Caren Jellerson, the GCES music teacher, "was wearing a 'love is love' shirt and the same lanyard" as McPhail. Id. ¶ 32. The Roanoke County Education Association representative circled back to inform McPhail, as well as McClung and Hogan, that McPhail could continue to wear the lanyard. Id. ¶ 33. McPhail explained to Brubaker that she wore the lanyard "for all of GCES's students, faculty, and staff to feel safe and supported," but Brubaker allegedly still criticized McPhail for doing so. Id. ¶ 34.

McPhail took leave in accordance with the Family and Medical Leave Act to care for her dying father from December 2022 to February 2023. Id. ¶¶ 36-37. During this period, GCES staff members submitted a letter to McClung and Hogan "expressing frustration with Principal Brubaker's leadership." Id. ¶ 36. McPhail was uninvolved in submitting the letter, but McClung blamed McPhail for the letter when she returned from leave. Id. ¶ 37. McPhail alleges that "the only explanation for this irrational accusation was that Ms. McPhail was being targeted due to her efforts to protect and support the music teacher and LGBTQ+ teachers, staff, and students at GCES." Id. ¶ 38. McPhail informed McClung and Brubaker that Brubaker, along with some other teachers and certain parents, "were subjecting GCES's music teacher and another staff member . . . to false accusations and intimidation" due to their association with and advocacy for the LGBTQ+ community. Id. ¶ 39.

On March 1, 2023, McClung texted Hudson that she would be calling McPhail in for a meeting the next day and mentioned "McPhail being potentially reassigned due to 'the

concerns,'" to which Hudson replied, "Sounds good!" Id. ¶ 41. At the meeting on March 2, 2023, McClung allegedly "called Ms. McPhail's integrity and leadership into question, based on information that [McClung] knew was false." Id. ¶ 40. On March 8, 2023, McPhail received a letter from McClung "outlining alleged deficiencies in her performance as Assistant Principal." Id. ¶ 42. McPhail alleges that the contents of the letter "were pretextual and fabricated in retaliation for her reporting the discriminatory treatment regarding the lanyard to the Roanoke County Education Association, as well as for her association with and advocacy for LGBTQ+ teachers, staff, and students." Id.

In April 2023, a parent, Damon Gettier, complained about the rainbow symbols at GCES to Brubaker, Nicely, and other School Board members. Id. ¶ 44. Specifically, Gettier was in contact with Greenway, Hudson, and a former School Board member, Thomas McCracken, for the purpose of removing LGBTQ+ messaging and imagery from the school. Id. ¶ 45. McCracken informed Gettier that McCracken and Hudson would tour GCES so they could "highlight the issues," to which Gettier responded that McPhail "usually has some gay pride on display daily." Id. ¶ 49.

On April 15, 2023, Gettier reported to McCracken and Greenway "that the music room at GCES has gay pride flags and rainbows, as well as a poster with the message, in rainbow letters, 'Hate Has No Home Here.'" Id. ¶ 50. McCracken responded, noting that Greenway and Hudson, as well as School Board member Cheryl Facciani "are doing everything they can, and will be doing more to address issues like these." Id. ¶ 51.

On the same day, Hudson asked Brubaker if the music teacher, Caren Jellerson, had pride flags in her classroom, to which Brubaker responded that there were little flags as well

as a yard sign that said "all are welcome." Id. ¶¶ 52-53. Brubaker texted Hudson further, stating

that "'God gave her a gift' in that Caren Jellerson was hired by another school system, to which

[Defendant] Hudson replied, 'Thank goodness' and a smile emoji." Id. ¶ 53. Brubaker said

that Jellerson's maternity leave had "been a huge weight lifted," and added: "God is working!"

Id. ¶ 54. Hudson replied with a heart emoji. Id.

During Jellerson's leave, Brubaker went to the music classroom and took pictures of

all the rainbow-themed items. Id. ¶ 55. Among the items depicted in the photos that Brubaker

collected, there was a poster with the words "Hate Has No Home Here" and five hearts held

by hands with diverse skin tones. Id. ¶ 56. Other images included "a circular rug with a rainbow

pattern, a small 'Love is Love' poster, a miniature artificial tree with rainbow hues, a nutcracker

holding a rainbow flag, a pillow with the words, 'All Welcome,' and a sign with the repeating

words, 'Everyone Welcome.'" Id.  Brubaker sent these photos to McClung, who replied,

"Most aren't good." Id. ¶ 57. The next day, Brubaker went back to Jellerson's classroom and

placed all of the rainbow-themed items in a trash bag in the closet. Id. ¶ 62.

The following day, April 19, 2023, Brubaker met with Damon Gettier and his wife, Alli

Gettier, in Jellerson's classroom. Id. ¶ 65. Brubaker told the substitute teacher to step out so

that she could meet with the Gettiers alone. Id. When another teacher came into the room

during the meeting, Brubaker insisted that the teacher leave, too. McPhail alleges that this

practice was unusual since "administrators typically conduct parent meetings in an

administrative office or conference room" and it is atypical to ask a teacher to leave a

classroom for a parent meeting. Id. ¶ 66. While in the classroom with the Gettiers, Brubaker

allegedly showed her phone to the Gettiers, "presumably of the photos she took." Id. ¶ 65.

Brubaker then moved the "trash bag that had been filled with the rainbow-themed items" into her office. Id. She also took down students' drawings of rainbows or rainbow-colored shapes because the Gettiers "saw it as 'influence.'" Id. ¶ 67.

Later that same day, Damon Gettier "streamed a video on Facebook live, calling on parents to go to GCES to witness the purportedly 'disturbing' things happening there." Id. ¶ 68. Gettier also reported to Greenway and Thomas McCracken that McPhail's wearing of a "gay pride lanyard" was "a criminal offense" and "child abuse." Id. ¶ 73. Greenway responded to Gettier, assuring him that he was "on the same side" and would speak to Hudson about it. Id. ¶ 74. He further stated: "It's got to stop. They are going to ruin public education if they aren't careful." Id. McClung also texted with Alli Gettier, assuring her that she would walk through other classrooms "to make sure there's nothing else there" and that "this was being addressed and 'taken seriously.'" Id. ¶ 70. McClung then notified Nicely of Gettier's Facebook post, stating: "The Glen Cove situation has become a hot mess. I'm going out there first thing in the morning and dealing with the staff involved. [Principal Brubaker] and I are also going to check in each class to make sure there's no other paraphernalia anywhere else." Id. ¶ 72.

Gettier, in a group chat with McCracken and Greenway, added Hudson to the chat to discuss next steps. Id. ¶ 79. McCracken stated that Hudson "shares our worldview and can put some teeth" in their efforts. Id. Greenway agreed, stating: "Absolutely the right thing to do. And Brent [Hudson] will understand completely as he agrees with us. . . We work well together. Indoctrination is not something i will accept as long as im on the board. We have to maneuver on some issues to follow legalities but I will push back every day on indoctrination

or leading our kids to certain beliefs." Id. ¶ 80. Hudson confirmed that he would "take care of

this tomorrow" and in response to Gettier's resending of a photo of the school counselor

wearing sunglasses with a rainbow frame, Hudson stated, "Rest assured this will be handled.

This is ridiculous and I'm truly sorry. I will give you a call tomorrow." Id. ¶ 86.

The next day, April 20, 2023, McClung and Brubaker "handled" McPhail by calling her

into a meeting to inform her that her "Love is Love" lanyard and rainbow-themed items were

considered promotion of a controversial subject, particularly as a result of Damon Gettier's

Facebook video. Id. ¶¶ 87-88. Specifically, they instructed McPhail to cease wearing, using, or

displaying a range of rainbow items, including a bracelet, earrings, sunglasses, desk décor, a

multi-colored umbrella, wall art, and clothing.[2] Id. ¶ 89.

McPhail alleges that she kept many of these items in her office "to create a more

welcoming environment by brightening it up, not just with rainbows but several other bright

shapes and objects, because it had no windows." Id. ¶ 90. McPhail also alleges that McClung

and Brubaker, along with GCES administration, "only required teachers who identified as

---

[2] "Specifically, Assistant Superintendent McClung and Principal Brubaker forbade Ms. McPhail from wearing, using, or displaying the following items:

    a. A t-shirt that had the word "Human" on it in rainbow colors;
    b. The "Love is Love" lanyard;
    c. Earrings that had rainbow colors in the tassels;
    d. A rainbow bracelet;
    e. A white badge holder that was white with the words "Hold On To Hope";
    f. Another lanyard with rainbows that matched the aforementioned badge holder;
    g. A multi-colored umbrella;
    h. Rainbow sunglasses;
    i. A wooden sign shaped like a rainbow and cloud and depicting the words, "When it rains, look for the rainbow";
    j. A painting given to Ms. McPhail by a GCES employee depicting the words "be kind" and a gnome wearing a hat featuring a rainbow;
    k. A pillow depicting two puppies wearing rainbow sweaters; and
    l. A small wooden rainbow heart depicting the words "#love." Id. ¶ 89

9

LGBTQ+ or associated with and advocated for … LGBTQ+ teachers, staff, and students to remove such personal effects as described above." Id. ¶ 91. According to McPhail, "staff members and teachers who did not fit in these categories (or whom GCES administration were unaware of) were permitted to keep rainbow and multi-colored decorations and items in their classrooms and offices, on the grounds that their use of such items did not send the same message." Id. Further, McPhail states that administrators permitted other "employees to wear T-shirts with Christian themes and messages, as well as cross necklaces; they also permitted an employee to display a decoration bearing a 'Black Lives Matter' message." Id. ¶ 92. McPhail alleges that the GCES administration "targeted employees who were allies of and advocated for the LGBTQ+ community" while simultaneously permitting these displays of support for other causes and groups by other employees at the school. Id.

Also, during the April 20, 2023, meeting, McClung stated to McPhail: "'I don't know if you're bisexual or . . .' and then paused, as if waiting for Ms. McPhail to affirm her suspicion." Id. ¶ 93. McPhail did not respond to McClung's comment. Id.

Later that day, McClung informed Brubaker that Jim Bradshaw, the RCPS Director of Human Resources, would be in touch with McPhail that afternoon. Id. ¶ 98. McClung instructed Brubaker not to say anything to McPhail about the pending visit from Human Resources, but to ensure McPhail does not "bolt out of that school" at the end of the day before Bradshaw could meet with her. Id. ¶¶ 99-100. Ultimately, Bradshaw delivered a letter to McPhail that afternoon, informing her "that it would be recommended to the School Board that she be reassigned to a teaching position, with concomitant reduction of pay, effective July 1, 2023." Id. ¶ 102. The letter provided the following reasons for McPhail's

10

reassignment/demotion: "a) Lack of leadership with PBIS[3] in [her] school; b) Boundary issues with staff;[4] and c) Speaking and acting in a derogatory manner regarding [her] supervisor."[5] Id. ¶ 104. McPhail alleges that these reasons are entirely pretextual and asserts that her demotion was motivated by her association with and advocacy for the LGBTQ+ community at GCES, her perceived sexual orientation, and in retaliation for her complaints regarding discrimination and LGBTQ+ issues at GCES. Id. ¶¶ 106-117.

McPhail alleges that the reduction in pay associated with her reassignment was "particularly detrimental" since she was nearing retirement, "and a reduction in salary at that point in her career would have resulted in a significantly lower monthly retirement amount[]." Id. ¶ 120. McPhail tendered her resignation, effective July 1, 2023, feeling as though she had "no other choice," alleging that this "forced resignation was tantamount to an actual discharge." Id. ¶ 121. For the rest of the 2022-2023 school year, McPhail alleges that McClung and Brubaker "continued to maintain a hostile work environment at GCES" for McPhail. Id. ¶ 122.

McPhail alleges that she feared for her safety after Damon Gettier streamed his video to Facebook live, so she had her adult son, Joey McPhail, who also works for RCPS, come sit with her in her office at the end of the school day after the teachers and buses had left.

---

[3] PBIS stands for Positive Behavioral Interventions and Supports. According to the information in the complaint, PBIS is "a program intended to create a consistent school-wide behavior management system and individual support systems for struggling students." ECF No. 1 ¶ 105. The complaint alleges that several members of the GCES PBIS team expressed frustration with PBIS team leadership allocation and highlighted Principal Brubaker's lack of participation in the program. The facts relating to this issue indicate McClung and Brubaker's disdain for the program and the people who were involved with it. McPhail was involved with PBIS but was allegedly not a part of the group that reported frustration with Brubaker's backseat role. Id. ¶¶ 105-13.
[4] To refute this assertion, McPhail's complaint states that "she was professional, did not lack discretion, and did not have inappropriate conversations with staff members." Id. ¶ 114.
[5] To refute this assertion, McPhail's complaint states: "To the contrary, when Principal Brubaker's qualifications were called into question by others at GCES meetings, Ms. McPhail defended Principal Brubaker." Id. ¶ 115.

Id. ¶ 132. Her husband, John McPhail, who is a School Resource Officer within RCPS, also stopped by GCES at the end of some school days. Id. ¶ 136. Brubaker complained to McClung that McPhail's husband and son were at GCES, to which McClung replied that they would "try to get" McPhail "to say she doesn't feel safe and then will give her the opportunity or should I say we will let her know she can go ahead and be done with a year." Id. ¶¶ 133-35. The following day, McClung and Brubaker informed McPhail that her son was not allowed to come into the building, and her husband could not be present at the school any longer. Id. ¶ 136. McPhail alleges that RCPS administrators wanted to make her feel unsafe so she would voluntarily abandon her position. Id. ¶ 138.

Finally, at a regularly scheduled School Board meeting on May 18, 2023, Damon Gettier spoke during the public comment portion, and made statements about McPhail and other staff members, accusing them of "child abuse, grooming, conditioning, and indoctrination." Id. ¶ 139. McPhail alleges that Hudson permitted Gettier to speak beyond the three-minute comment limit, and did not stop Gettier "when he became disrespectful and abusive." Id. ¶ 143. McPhail also alleges that Gettier sent McClung a script of his planned comments prior to the meeting, demonstrating her assent to his intended "defamatory statements regarding RCPS employees." Id. ¶ 146. Shortly after Gettier spoke at the meeting, McClung texted Gettier's wife "thank you." Id. ¶ 148.

After the School Board meeting on May 18, 2023, "dozens of citizens decided to hold a peaceful demonstration outside GCES with signs to support teachers and staff at Glen Cove Elementary School on May 26, 2023." Id. ¶ 154. Brubaker referred to the teachers and staff supporting the demonstration as "the rainbow people" in a communication with

Hogan. Id. ¶ 156. Nicely added, "We need to check to see if we have to allow them to demonstrate on school property." Id. ¶ 155.

On May 31, 2023, Brubaker texted McClung pictures of McPhail's desk, which had rainbow stickers on it. Id. ¶ 157. Brubaker wrote that McPhail "called out sick today, so today was a great day." McClung responded: "I'm so glad. You deserve a great day!!" Id. ¶ 158.

McPhail alleges that after she tendered her resignation on April 20, 2023, she began looking for other employment. Id. ¶ 160. Although she interviewed for an administration job with Roanoke City Public Schools and was told by their director of Human Resources that she was going to be offered the job, she was subsequently only offered a teaching position. Id. McPhail alleges that this is due to Gettier's comments at the meeting of May 18, 2023. Id. McPhail later accepted a position in Northern Virginia, and although the base salary is higher than her prior role, McPhail alleges that the additional living costs and relocation expenses have resulted in economic losses for her and her family. Id. ¶ 164. Further, McPhail alleges that the events detailed in the complaint took a personal toll on her life, including emotional distress, anxiety, and fear for her safety in her place of employment. Id. ¶¶ 165-66.

In her complaint, McPhail asserts fourteen claims, twelve against the School Board, and eight against individual defendants. She alleges several violations of Title VII (Counts I, II, III), violations of the VHRA (Counts IV, V, VI), violations of the First Amendment to the U.S. Constitution (Counts VII, VIII), violations of Section 12 of the Virginia Constitution (Counts IX, X), denial of Equal Protection in violation of the Fourteenth Amendment to the U.S. Constitution and Section 11 of the Virginia Constitution (Counts XI, XII), intentional

infliction of emotional distress (Count XIII), and tortious interference with business expectations (Count XIV).

At a hearing on the motion to dismiss, the court denied defendants' motion to dismiss Counts I, II, III, VII, VIII, IX, and X against the Roanoke County School Board. This opinion discusses the remaining claims.

## II.    STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986); conclusory allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," Veney v. Wyche, 293 F.3d 726,

730 (4th Cir. 2002) (quoting <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001)).

"When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" <u>Evans v. B.F. Perkins Co.</u>, 166 F.3d 642, 647 (1999) (citing <u>Richmond, Fredericksburg & Potomac R. Co. v. United States</u>, 945 F.2d 765, 768 (1991)). The district court should grant the dismissal "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." <u>Id.</u> "[A] court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." <u>Cunningham v. Gen. Dynamics Info. Tech., Inc.</u>, 888 F.3d 640, 649 (4th Cir. 2018) (quoting <u>Ackerson v. Bean Dredging LLC</u>, 589 F.3d 196, 207 (5th Cir. 2009)).

## III.    ANALYSIS

### A. Virginia Human Rights Act Claims (Counts IV, V, VI)

McPhail brings several claims against the School Board under the Virginia Human Rights Act ("VHRA"), including discrimination on the basis of her perceived bisexual identity, harassment on the basis of her support for the LGBTQ+ community, and unlawful retaliation based on her display of support for LGBTQ+ community members.

The School Board argues that these claims must be dismissed for lack of subject matter jurisdiction because the School Board is entitled to sovereign immunity and the VHRA does not contain an explicit waiver of sovereign immunity. <u>See</u> ECF No. 20 at 11. The court agrees.

"Only the General Assembly can determine as a matter of policy whether the Commonwealth's sovereign immunity should be abrogated with regard to a particular type of legal action." See Ligon v. Cnty. of Goochland, 279 Va. 312, 317, 689 S.E.2d 666, 668-69 (2010); Afzall ex rel. Afzall v. Commonwealth, 273 Va. 226, 230, 639 S.E.2d 279, 281 (2007); see also Fogleman v. Commonwealth, No. 0841-22-2, 2023 WL 6065593, at *3 (Va. Ct. App. Sept. 19, 2023). The General Assembly may abrogate sovereign immunity "only when the statutory language has explicitly and expressly announced such a waiver." See Ligon, 279 Va. at 317, 689 S.E.2d at 669; Afzall, 273 Va. at 230, 639 S.E.2d at 281; Fogleman, 2023 WL 6065593, at *3); Rector & Visitors of the Univ. of Va. v. Carter, 267 Va. 242, 245, 591 S.E.2d 76, 78 (2004). "Commonwealth agencies are not bound by statutes of general application 'no matter how comprehensive the language, unless named expressly or included by necessary implication.'" Cuccinelli v. Rector, Visitors of Univ. of Va., 283 Va. 420, 426-27, 722 S.E.2d 626, 630 (2012) (emphasis in original). "A necessary implication is an implication so strong in its probability that anything to the contrary would be unreasonable." Cuccinelli, 238 Va. at 429, 722 S.E.2d at 632. "[T]here can be no waiver of sovereign immunity by implication." Hinchey v. Ogden, 226 Va. 234, 241, 307 S.E.2d 891, 895 (1983).

"The VHRA does not expressly waive sovereign immunity for any Commonwealth agency." Mais v. Albemarle Cnty. Sch. Bd., 657 F.Supp.3d 813, 826 (W.D. Va. 2023). "Although the VHRA contains comprehensive language that outlines 'the policy of the Commonwealth,' which purports to 'safeguard all individuals' and 'prohibit discriminatory practices,' it does not contain a clear and unequivocal waiver of sovereign immunity." Fogleman, 2023 WL 6065593, at *3 (citing Va. Code § 2.2-3900).

16

McPhail argues that governmental and political subdivisions, including the School Board, are included within the VHRA's definition of employer, and thus the School Board is not entitled to sovereign immunity on the VHRA claims. See ECF No. 23 at 24. In support of this argument, McPhail begins by noting that the VHRA's policy is to "safeguard all individuals within the Commonwealth from unlawful discrimination in employment because of race, color, religion, ethnic or national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, sexual orientation, gender identity, disability, or military status." Va. Code § 2.2-3900(B)(2). She subsequently explains that the VHRA definitions section defines an employer, "for purposes of unlawful discharge under subdivision B1 on the basis of . . . sex, sexual orientation, gender identity . . . any person employing more than five persons." Va. Code. § 2.2-3905. McPhail then provides the definition of "person" as described by the Virginia Administrative Code, which includes "any individual, corporation, partnership . . . government, political subdivision, or any other legal or commercial entity and any successor, representative, agent, agency, or instrumentality thereof." See 1 Va. Admin. Code §§ 45-20-10, 45-20-20 ("The purpose of this chapter is to supplement the Virginia Human Rights Act . . . ."). Using these definitions, McPhail maintains that the School Board qualifies as an employer under the VHRA, and that, as such, sovereign immunity has been waived under that Act. See ECF No. 23 at 24-28.

The VHRA supplies a definition for "employer," but this explicit definition does not include agencies of the Commonwealth, nor local school boards. Va. Code § 2.2-3901. Even the definition of "person" within the Virginia Administrative Code, though inclusive of the terms "government" and "political subdivision," does not encompass the School Board such

17

that it would provide a waiver of sovereign immunity. 1 Va. Admin. Code § 45-20-20. It simply imports the general definition of "person" from Virginia Code § 1-230. But "Virginia Code § 1-230 cannot serve as an explicit waiver of sovereign immunity for the VHRA." See Mais, 657 F.Supp.3d at 826; see also Jordan v. Sch. Bd. of Norfolk, 111 Va. Cir. 429, 430 (2023) ("The VHRA contains a specific definition of 'employer,' which does not include Commonwealth agencies; that specific definition prevails over the Virginia Code's general definition of 'person.'"). To the extent that McPhail asks the court to include the School Board within the VHRA's definition of "employer," with the effect of waiving sovereign immunity for the School Board, the court declines to do so. As previously stated, "only the General Assembly can determine as a matter of policy whether the Commonwealth's sovereign immunity should be abrogated." Ligon, 279 Va. at 317, 689 S.E.2d at 668-69.

McPhail urges the court to reconsider the decision in Mais, as the plaintiff in that case did not cite the definitions within 1 Va. Admin. Code § 45-20-20. However, in Jordan v. Sch. Bd. of the City of Norfolk, when the plaintiff similarly argued that the definitions in § 45-20-20 should have changed the outcome in Mais, the Jordan court twice cited Mais's reasoning with approval.[6] Jordan, 111 Va. Cir. at 430, 432. This court is not persuaded by the argument to reconsider Mais and concludes that the VHRA does not explicitly waive sovereign

---

[6] The plaintiff in Jordan filed a Motion for Reconsideration following the court's issuance of a letter opinion which determined that the school board was entitled to sovereign immunity. The plaintiff argued, as McPhail does here, that Mais was wrongly decided. However, the Jordan court's original letter opinion stated, "The Court finds that the Mais analysis . . . is sound." Jordan v. Sch. Bd. of Norfolk, 111 Va. Cir. 429, 430 (2023). The second opinion, following the Motion for Reconsideration, also states, "The Court does not consider that Mais was decided incorrectly. Mais cited and followed the controlling authority of Cuccinelli v. Rector and Visitors, 283 Va. 420, 722 S.E.2d 626 (2012), where the Virginia Supreme Court refused to import the definition of 'person' found in Virginia Code § 1-230, into the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1." Jordan v. Sch. Bd. of City of Norfolk, 111 Va. Cir. 429A, 432 (2023).

immunity. See Correa v. Rector & Visitors of Univ. of Va., No. 3:24cv65, 2025 WL 2076480, at *6 (W.D. Va. July 23, 2025) (dismissing a VHRA claim against UVA because the General Assembly did not waive sovereign immunity under the VHRA).

McPhail additionally relies on model policies issued by the Virginia Department of Education that state that the School Division complies with the VHRA. These "regulations" promulgated by the Virginia Department of Education cannot provide the basis for a waiver of sovereign immunity. "Statutes, and not regulations, must provide the clear waiver of immunity." Jordan, 111 Va. Cir. at 431.

Finally, McPhail puts forth Roanoke County School Board's policies, which contain non-discrimination language that is similar to the promise of the VHRA. McPhail also argues that the School Board's website's language "track[s] the VHRA." ECF No. 23 at 26. While the School Board may have believed it was subject to suit under the VHRA based on its own policies and job postings on the school's website, ECF No. 23-2, this belief does not prevent the School Board from relying on the doctrine of sovereign immunity. See Jordan v. Sch. Bd. of City of Norfolk, 111 Va. Cir. 429A, 432 (2023) (explaining that a school board's belief that it was subject to suit under the VHRA does not prevent it from relying on sovereign immunity).

McPhail's claims against the School Board for violations of VHRA are barred by sovereign immunity. Since sovereign immunity applies, the court lacks subject matter jurisdiction to adjudicate the claims, and Counts IV, V, and VI against the School Board must be dismissed.

**B. Retaliation, and Viewpoint and Content Discrimination in Violation of the First Amendment: Qualified Immunity (Counts VII and VIII against Individual Defendants)**

The individual defendants contend that the constitutional claims against them must be dismissed because they are entitled to qualified immunity. "Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Cannon v. Vill. of Bald Head Island, N.C., 891 F.3d 489, 497 (4th Cir. 2018) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)). "To overcome qualified immunity, a plaintiff must show (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." Cannon, 891 F.3d at 497 (citing Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). "[A] constitutional right is clearly established when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Cannon, 891 F.3d at 497 (internal citations omitted). In other words, the legal question must be "beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

In making this qualified immunity determination, "the better approach [is] to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all before turning to the question of whether the right was clearly established so that an objectively reasonable officer would have known of it." McVey v. Stacy, 157 F.3d 271, 276 (4th Cir. 1998) (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).

**a. Retaliation**

"The First Amendment protects public employees from termination of their

employment in retaliation for their exercise of speech on matters of public concern." McVey
v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998). This protection is "not absolute and must be
tempered by the government's interest in governmental effectiveness, efficiency, order, and
the avoidance of disruption." Id. To determine whether a public employee has stated a claim
under the First Amendment for retaliatory discharge, the court "must determine (1) whether
the public employee was speaking as a citizen upon a matter of public concern or as an
employee about a matter of personal interest; (2) whether the employee's interest in speaking
upon the matter of public concern outweighed the government's interest in providing effective
and efficient services to the public; and (3) whether the employee's speech was a substantial
factor in the [retaliatory employment action]." Id. at 277-78. In making this determination, the
court must also balance "the interests of the [teacher], as a citizen, in commenting upon
matters of public concern and the interest of the State, as an employer, in promoting the
efficiency of the public services it performs through its employees." Id. at 277 (citing Pickering
v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563, 568 (1968)).

The first prong of the McVey test asks whether McPhail was speaking as a citizen upon
a matter of public concern. "Speech involves a matter of public concern when it involves an
issue of social, political, or other interest to a community." Love-Lane v. Martin, 355 F.3d 766,
776 (4th Cir. 2004). In conducting the analysis of whether speech involves a matter of public
concern, the court considers "the content, form, and context of a given statement, as revealed
by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). The Fourth Circuit has
stated that "[t]he focus is . . . upon whether the 'public' or the 'community' is likely to be truly
concerned with or interested in the particular expression, or whether it is more properly viewed

21

as essentially a 'private' matter between employer and employee." Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir. 1985). The Supreme Court and the Fourth Circuit have recognized that "a public employee's speech about racially discriminatory practices, particularly in public schools, involves a matter of public concern." Love-Lane, 355 F.3d at 776; see also Connick, 461 U.S. at 146; Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414-16 (1979). The Fourth Circuit also determined that discrimination based on sex within a school system is likewise a matter of public concern. See Seemuller v. Fairfax Cnty. Sch. Bd., 878 F.2d 1578, 1582 (4th Cir. 1989) (holding that a letter protesting a practice of sex-based discrimination in the physical education department is "no less a matter of public interest" than a charge that a school engages in race-based discrimination).

At the 12(b)(6) stage, McPhail has sufficiently alleged that her expressive conduct in support of the LGBTQ+ community is a matter of public concern and protected by the First Amendment.

The second McVey prong, involving a test known as "Pickering balancing," requires the court to assess whether McPhail has sufficiently alleged that her interest in First Amendment expression outweighs the School Board's interest in the efficient provision of public services. McPhail alleges that her "expressive conduct did not result in a material or substantial interference or disruption in the normal activities of GCES." ECF No. 1 ¶¶ 253, 270, 288, 307. In applying the second McVey prong, the court "must take into account the context of the employee's speech and the extent to which it disrupts the operation and mission of the [school]." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 317 (4th Cir. 2006). Factors relevant to this inquiry include whether a public employee's speech:

> (1) Impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

Id.

Defendants argue that McPhail's own alleged facts indicate that her First Amendment expressive conduct (such as wearing and displaying rainbows) both "interfered with the operation of GCES and . . . conflicted with her own responsibilities as assistant principal." ECF No. 24 at 24. According to defendants, McPhail's display of rainbows and LGBTQ+ symbols necessitated numerous meetings between McPhail and other administrators, which required all of the administrators to "withdraw from their respective duties" to have these discussions. Id. Consistent with her allegations in the complaint, McPhail argues that "the presence of rainbows in her office and wearing clothing with rainbows and hearts did not in any way disrupt the efficient operation of the school." ECF No. 23 at 39. According to McPhail, her "conduct promoted inclusivity and thus aligned with, rather than undermined, the mission of the public school to which she was employed." Id. McPhail further argues that any "disruption" at GCES resulted from Gettier's complaints and defendants "acting upon his wishes." Id. at 40.

At the pleadings stage, McPhail has sufficiently alleged that her free speech interests outweigh the detrimental effect, if any, her expression may have had on the efficiency of

GCES. As the Fourth Circuit held in Ridpath, resolution of this Pickering balancing must await further factual development:

> Once a factual record is developed through discovery, the evidence could support the inference that Ridpath's workplace was impaired as a result of his comments and that he simply had to be terminated from his adjunct teaching position. Such a question, however, is not to be assessed under Rule 12(b)(6) but in Rule 56 summary judgment proceedings. See McVey, 157 F.3d at 278-79 (affirming district court's decision to defer deciding qualified immunity until "record is better developed" in part because complaint did not "resolve on its face" second prong of McVey test). At the Rule 12(b)(6) stage, Ridpath's allegations warrant the inference that his free speech interests outweigh the detrimental effect, if any, his comments may have had on the efficiency of his workplace. Indeed, read in the proper light, the Amended Complaint alleges that he was relieved of his adjunct teaching position for protected statements that had no impact on his workplace whatsoever. Accepting those allegations as true and giving Ridpath the benefit of the reasonable factual inferences, we cannot say that "it appears beyond all doubt that Ridpath can prove no set of facts" to tip the Pickering balance in his favor. (citation omitted). Accordingly, Ridpath has sufficiently shown that his interest in speaking outweighed the University's interest in promoting the efficient provision of public services, and he has satisfied the second prong of the McVey test.

Ridpath, 447 F.3d at 318.

The third prong of the McVey test requires McPhail to demonstrate a causal relationship between her protected expression and her demotion. The allegations of the communications between various individual defendants regarding "handling" McPhail and seeking "repercussions" for her in response to her "gay pride paraphernalia" are sufficient to show a causal relationship between her expression and the decision to reassign her at the 12(b)(6) stage.

Given that McPhail has adequately alleged that her First Amendment rights were violated, the final hurdle for her to overcome is qualified immunity—she must show that the defendants are not entitled to qualified immunity because the law was clearly established, and a reasonable official would have known that the action violated McPhail's rights. See Mills v. Steger, 64 F. App'x 864, 874 (4th Cir. 2003). "Although plaintiffs have prevailed in some First Amendment retaliation cases, most do not, simply because the individualized assessment required by the Pickering balancing test means we can rarely say that the law was clearly established and that reasonable officials would have been aware of the law." Id. (internal citations omitted).

Defendants contend that McPhail's retaliation claim is not based on a clearly established First Amendment right. This argument is unavailing.

According to McPhail's complaint, she was demoted in 2023. At that time, there were decades of Fourth Circuit and Supreme Court precedent suggesting that a public employee could not be fired solely for their constitutionally protected expression. See, e.g., Ridpath, 447 F.3d at 320 (finding that allegations of retaliation in response to a teacher making protected statements constituted a clearly established violation of law of which a reasonable official would have known); Connick, 461 U.S. at 142 ("For at least 15 years it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."); McVey, 157 F.3d at 277 ("The First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern."). Thus, the prohibition

25

against retaliation for protected speech was clearly established at the time McPhail was demoted.

The final step in this inquiry is whether a reasonable official would have been aware that demoting McPhail in response to her LBGTQ+ expressions of support violated her constitutionally protected free speech rights. In making this determination, "we do not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues." McVey, 157 F.3d at 277. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

While further factual development in this case may provide additional context for the decision to demote McPhail, the facts alleged in the complaint, viewed in the light most favorable to her, clearly allege that the individual defendants retaliated against McPhail for expressing her support for the LGBTQ+ community. This choice "does not merely implicate the gray edges of the right [McPhail] asserts; it goes to its very core." Ridpath, 447 F.3d at 321. Therefore, McPhail's retaliation claim alleges a violation of a clearly established right of which a reasonable official would have known. As such, at least at the pleadings stage, this case cannot be dismissed on the basis of qualified immunity. The court expects to revisit this issue following further factual development.

### b. Viewpoint and Content Discrimination

"[T]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 527 (2022) (citing Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)). Viewpoint discrimination is an "egregious

form of content discrimination." <u>Rosenberger v. Rector & Visitors of the Univ. of Va.</u>, 515 U.S. 819, 829 (1995). "To state a claim for viewpoint discrimination, Plaintiffs must allege that there has been some kind of regulation, or attempted regulation, of some types of speech, but not other types of speech." <u>Ibanez v. Albemarle Cnty. Sch. Bd.</u>, 80 Va. App. 169, 208, 897 S.E.2d 300, 320 (Va. Ct. App. 2024); <u>see</u> <u>Vlaming v. West Point Sch. Bd.</u>, 302 Va. 504, 574 n.37, 895 S.E.2d 705, 743 n.37 (2023) (teacher stated a claim for viewpoint discrimination and retaliation when he alleged that the school board fired him "for not expressing the Board's views regarding gender identity").

McPhail alleges that "defendants engaged in content and viewpoint discrimination by banning only messages and items they associated with the LGBTQ+ community, while permitting other expressive items, including those of a religious or ideological nature." Compl., ECF No. 1 ¶ 254. "RCPS had no written policy restricting expressive attire or decorations, and, in any event, Defendants failed to restrict expression in a viewpoint-neutral manner." <u>Id.</u> ¶ 256. She also alleges that some employees were permitted "to wear T-shirts with Christian themes and messages, as well as cross necklaces" and another employee displayed a decoration in their classroom that included the message "Black Lives Matter." <u>Id.</u> ¶ 92.

These allegations, taken as true, are sufficient to state a claim of viewpoint discrimination in violation of the First Amendment.

In support of the argument that the individual defendants should not be entitled to qualified immunity on this claim, McPhail argues that free speech and expression are clearly established rights, and a reasonable official would have known that their conduct purporting to limit these rights is a violation of the Constitution. The court agrees.

Sexual orientation and gender identity are "among many 'controversial subjects' that are rightly perceived as 'sensitive political topics." Vlaming, 302 Va. at 569, 895 S.E.2d at 740 (citing Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31, 585 U.S. 878, 913-14 (2018)). "Speech on such matters occupies the highest rung of the hierarchy of First Amendment values and merits special protection." Id. (citations omitted). "Compelling an educator's 'speech or silence'" on issues relating to sexual orientation and gender identity "would cast a 'pall of orthodoxy over the classroom' on a topic that has 'produced a passionate political and social debate."' Id. (citing Meriwether v. Hartop, 992 F.3d 492, 508 (6th Cir. 2021)). "Whether at the highest or lowest level, the government has no inherent power to declare by ipse dixit that controversial ideas are now uncontroversial." Id.[7]

Again, at this stage of the proceedings, McPhail's allegations are sufficient to overcome the motion to dismiss filed by the individual defendants based on qualified immunity. Further factual development is required.

## C. Motion to Dismiss Counts VII and VIII for Failure to State a Claim against Defendants Hudson, Greenway, and Nicely

Given that at this stage the court cannot conclude that the individual defendants should be dismissed on qualified immunity grounds, the court must also address the Rule 12(b)(6) motion filed by defendants Hudson, Greenway, and Nicely. These three defendants move to dismiss the First Amendment retaliation claims and viewpoint discrimination claims against them in their individual capacity for failure to state a claim, arguing that their conduct does

---

[7] See also W.V. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

not rise to the level of personal involvement that would require them to be held responsible. Defendants argue that the lack of connection between their actions and McPhail's demotion is fatal to the claims against them.

The complaint clearly alleges that Hudson was involved in the suppression of LGBTQ+ expression at GCES, and particularly involved in suppressing expression by McPhail. Hudson was informed of McPhail's possible reassignment to a teaching position and expressed a desire for "repercussions" for those who were supporting LGBTQ+ expression. ECF No. 1 ¶ 64. In response to Gettier sending Hudson a photo of a GCES employee wearing LGBTQ accessories, Hudson replied: "Rest assured this will be handled. This is ridiculous and I'm truly sorry." Id. ¶ 86. He also told Gettier that he had just spoken with McClung and "[w]e will take care of this tomorrow." Id. ¶¶ 83-84. The very next day, McClung and Brubaker met with McPhail to forbid her from wearing or displaying rainbow items. Id. ¶¶ 87-89. On that same day, McPhail received notice of her demotion to a teaching position with concomitant reduction of pay. Id. ¶ 102.

Viewing the allegations in the complaint in the light most favorable to the plaintiff, McPhail alleges that Hudson was involved in the decision to tell her to stop wearing and displaying rainbow items, as well as the decision to demote her. The court denies the motion to dismiss the viewpoint discrimination claim and the retaliation claim against Hudson in Counts VII and VIII.

Further, the complaint also indicates that Greenway was similarly involved in the suppression of LGBTQ+ expression by McPhail and at GCES in general. Greenway endorsed the alleged discriminatory efforts against McPhail through his constant communication with

Gettier and his comments that "indoctrination is not something I will accept." Id. ¶ 80. He also suggested that as a board member he may need to "maneuver on some issues to follow legalities" and said, "it's got to stop" in reference to McPhail's "gay pride lanyards" and other rainbow items. Id. ¶¶ 73-74, 80. Further, Greenway confirmed that Hudson should be involved in Gettier's group chat, stating, "Absolutely the right thing to do," in response to Gettier adding Hudson to the chat. Id. ¶ 80.

The allegations of Greenway's involvement with Hudson (and Gettier) in discussing the removal of LGBTQ+ imagery and symbols are sufficient to survive the motion to dismiss. Viewing the allegations in the complaint in the light most favorable to the plaintiff, McPhail alleges that Greenway was involved in the decision to tell her to stop wearing and displaying rainbow imagery and was likewise involved in the decision to demote her. The court denies the motion to dismiss the viewpoint discrimination claim and the retaliation claim against Greenway in Counts VII and VIII.

On the other hand, the complaint contains no allegations of actions taken by Nicely. To be sure, the complaint alleges that Nicely was made aware of the efforts of his subordinates and colleagues to suppress LGBTQ+ expression and "deal with" McPhail's expression at GCES. See, e.g., id. ¶ 72. But there are no allegations of actions taken by Nicely, except for the rather vague and conclusory sentence in paragraph 44, referencing Brubaker, Nicely, and "certain School Board members," and stating that "[t]hey immediately ceded to this parent's demands and began targeting the classrooms of teachers and staff who identified as LGBTQ+ or who associated with and advocated for the LGBTQ+ community." Id. ¶ 44. In the absence

of any other specific allegations of conduct undertaken by Nicely, the complaint fails to state a claim against him.

Given the paucity of allegations of specific conduct by Nicely, the court grants his motion to dismiss the viewpoint discrimination claim and the retaliation claim. In addition to Counts VII and VIII, the individual claims against Nicely in Counts IX, X, and XIV are dismissed as well.[8]

Moreover, Brubaker, Hogan, and McClung moved to dismiss Counts VII and VIII only on the basis of qualified immunity. Since the court has determined not to dismiss these claims on qualified immunity grounds, and Brubaker, Hogan, and McClung did not move to dismiss for failure to state a claim, Counts VII and VIII against Brubaker, Hogan, and McClung will be permitted to proceed.

In sum, the court denies the motion to dismiss Counts VII and VIII against Brubaker, Hogan, Hudson, McClung, and Greenway. The court grants the motion to dismiss Counts VII and VIII against Nicely.

### D. Equal Protection (Count XI)

McPhail alleges that the School Board and the individual defendants violated her rights under the Equal Protection Clause of the Fourteenth Amendment by treating her differently from others who are similarly situated. This claim is based entirely on her First Amendment free speech claims.

---

[8] Should discovery reveal specific actions taken by Nicely in furtherance of McPhail's claims, McPhail may move for leave of court to file an Amended Complaint containing such specific allegations.

31

The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prevail on an Equal Protection claim, a plaintiff must demonstrate that she "has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001); see also Talley v. Folwell, 133 F.4th 289, 303 (4th Cir. 2025).

The claims based on the allegation that McPhail was treated differently in response to her display of LGBTQ+ imagery are, at their core, free speech retaliation claims that do not implicate the Equal Protection Clause. See Kirby v. City of Elizabeth City, N.C., 388 F.3d 440, 447-48 (4th Cir. 2004); Martin v. Duffy, 858 F.3d 239, 252 (4th Cir. 2017).

Specifically, McPhail alleges that other teachers and staff members who did not associate with the LGBTQ+ community "were permitted to keep rainbow and multi-colored decorations and items in their classrooms and offices, on the grounds that their use of such items did not send the same message." Compl., ECF No. 1 ¶ 91. Regardless of whether McPhail herself identifies as a member of the LGBTQ+ community, her complaint makes clear that the reason for the different treatment was based on the message her rainbow items were sending to students and parents. She was required to dispose of expressive items, including specific signs and clothing pieces, due to the message associated with them. This falls squarely in the realm of First Amendment viewpoint discrimination. She was also demoted, in part, because of her display of expressive items. This, again, falls squarely in the

realm of First Amendment retaliation. Because McPhail's equal protection claim is best characterized as a mere rewording of her First Amendment claims, which the court has already determined survive the motion to dismiss, see Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999), the court will grant defendants' motion to dismiss the equal protection claim against all defendants in Count XI.

### E. Counts IX, X, and XII under the Virginia Constitution

In addition to the federal constitutional claims, McPhail brings claims under the Virginia Constitution against all defendants, including viewpoint and content discrimination claims and retaliation claims under Article I, § 12. See ECF No. 1 ¶¶ 292, 305.[9]

Since the court has determined that McPhail has sufficiently stated her First Amendment claims, her claims under Article I, § 12 will also survive the motion to dismiss. As the Supreme Court of Virginia has stated:

> When we interpret the protection given to free speech by the Constitution of Virginia as being coextensive with the free speech provisions of the federal First Amendment, we are not outsourcing to the federal courts our decision-making power over the Constitution of Virginia." (citations omitted)). We are merely acknowledging that the then-existing interpretation of the First Amendment by the United States Supreme Court matches our own understanding of Article I, Section 12 of the Constitution of Virginia. The Virginia protection of free speech coexists (and is thus coextensive) with the federal protection,

---

[9] The School Board argues that each of these claims must be dismissed because the relevant provisions of the Virginia Constitution are not self-executing, and therefore there is no private cause of action for McPhail to rely upon. See ECF No. 20 at 13-16. The School Board cites Mais v. Albemarle County School Board, for the proposition that Article I, § 12 is not self-executing for claims of damages, only for "claims challenging laws or ordinances." 657 F.Supp.3d 813, 824-25 (W.D. Va. 2023). McPhail relies on a 2024 Virginia Court of Appeals decision, Ibanez v. Albemarle County School Board, to argue that Article I, §§ 11 and 12 are indeed self-executing, particularly with respect to claims for declaratory and injunctive relief. 80 Va. App. 169, 191, 897 S.E.2d 300, 311 (Va. Ct. App. 2024). Because McPhail's Virginia constitutional claims are coextensive with her First Amendment claims, the court declines to reach the issue of whether the Virginia constitutional claims are self-executing at the motion to dismiss stage.

> because, as we have understood both in specific cases, the former
> appeared to be at least as strong as the latter.

Vlaming v. West Point School Board, 302 Va. 504, 564, 895 S.E.2d 705, 737 (2023).

Therefore, the court denies defendants' motion to dismiss Counts IX and X against the individual defendants, with the exception of Nicely.

McPhail also asserts an Equal Protection claim under Article I, § 11 of the Virginia Constitution. See ECF No. 1 ¶¶ 352, 353. The Virginia Supreme Court has held that Article 1, Section 11 "is no broader than the equal protection clause of the Fourteenth Amendment to the Constitution of the United States." Archer v. Mayes, 213 Va. 633, 638, 194 S.E.2d 707, 711 (1973). Since McPhail failed to state an equal protection claim under the Fourteenth Amendment to the U.S. Constitution, the court finds that she also fails to state a claim under Article I, § 11 of the Virginia Constitution, and Count XII must be dismissed against all defendants.

## F. Intentional Infliction of Emotional Distress (Count XIII)

McPhail also asserts a claim of intentional infliction of emotional distress against the individual defendants Hudson, McClung, and Brubaker. The court concludes that the facts McPhail alleges are not sufficient to clear the high bar associated with the claim of intentional infliction of emotional distress ("IIED").

McPhail alleges that Hudson sought "repercussions" for McPhail, "coordinated with other defendants to infringe upon her free expression and ultimately, have her demoted." ECF No. 1 ¶ 358. She also alleges that Hudson was responsible for allowing Damon Gettier, an opinionated and vocal parent in the community, to exceed time limits at the school board meeting whilst calling McPhail a sexual predator and an abuser. Id.

34

She alleges, among other things, that McClung "spearheaded efforts to demote Ms. McPhail, drafting a letter of alleged performance deficiencies that were fabricated" and "concocted a scheme to attempt to manipulate Ms. McPhail into leaving her position early." Id. ¶ 359. She also alleges that McClung facilitated, alongside Hudson, the accusations by Damon Gettier and refused to address McPhail's safety concerns. Id.

Finally, McPhail alleges that Brubaker "coordinated with other Defendants to infringe upon Ms. McPhail's free expression; contributed to a letter fabricating alleged performance deficiencies on the part of Ms. McPhail and work[ed] with other Defendants to demote Ms. McPhail." Id. ¶ 360. She alleges that Brubaker "participated in a scheme to attempt to manipulate Ms. McPhail into leaving her position early." Lastly, she alleges that Brubaker was similarly involved in and approving of Damon Gettier's comments at the meeting, and Brubaker also refused to address McPhail's safety concerns. Id. ¶ 360.

As a result of these actions, McPhail alleges that she has suffered "and will continue to suffer extreme emotional distress." Id. ¶ 362. She alleges that "she no longer felt safe at her place of employment, within her home, or in her hometown" and that she "found herself having panic attacks, struggling to eat, and crying in the mornings before work." Id. She sought treatment from doctors and began taking anti-anxiety medicine "for the first time in her life." Id. She also has "not mentally been able to apply for other administrative positions" within RCPS so she has lost income. Id. She further alleges that she was fearful for the LBGTQ+ teachers and staff at the school. Id.

To state a claim for intentional infliction of emotional distress, a plaintiff must allege facts sufficient to show that: "1) the wrongdoer's conduct was intentional or reckless; 2) the

conduct was outrageous or intolerable; (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and (4) the resulting emotional distress was severe." Supervalu, Inc. v. Johnson, 276 Va. 356, 370, 666 S.E.2d 335, 343 (2008); see also Russo v. White, 241 Va. 23, 27, 400 S.E.2d 160, 162 (1991).

Defendants only contest the first three elements. The first element is satisfied "where the wrongdoer had the specific purpose of inflicting emotional distress" or "where [the wrongdoer] intended his specific conduct and knew or should have known that emotional distress would likely result." Womack v. Eldridge, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974); Jordan v. Shands, 255 Va. 492, 498, 500 S.E.2d 215, 218 (1998).

Brubaker, McClung, and Hudson argue that there are no facts indicating that they acted with intent to cause emotional distress or should have known that their actions would likely cause distress. While defendants may have been eager to please a complaining parent by giving in to his demands that the school get rid of the "pride paraphernalia," there are insufficient facts to state that defendants acted with an intent to cause McPhail emotional distress. Even taking the allegation that all three defendants coordinated to demote McPhail at face value, it cannot be said that a concerted effort to demote someone demonstrates an intent to cause emotional distress. McPhail cannot satisfy the first element.

To satisfy the outrageousness element, "it is insufficient for a defendant to have acted with an intent which is tortious or even criminal." Russo, 241 Va. at 27, 400 S.E.2d at 162. Instead, a defendant's conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. "Both state and federal courts applying

Virginia law have agreed that outrageousness does not objectively describe particular acts but instead represents an evaluation of behavior." Holley v. CVS Caremark Corp., No. 4:16-cv-00017, 2016 WL 4132316, at *3 (W.D. Va. Aug. 3, 2016). "[A]cts that would not establish outrageousness when viewed in isolation become outrageous when repeated to create a persistent pattern of offensive conduct." Id. (citing Faulkner v. Dillon, 92 F.Supp.3d 493, 501 (W.D. Va. 2015)).

No single incident in this case rises to the level of outrageousness that would state a claim for this tort. Acts that undermine a plaintiff's employment are not considered outrageous on their own. See Karpel v. Inova Health System Services, Inc., No. 96-347-A, 1997 WL 38137, at *7 (E.D. Va. Jan. 27, 1997) (explaining that firing the plaintiff "out of racial animosity or in retaliation for her race discrimination charge" would not rise to the level of outrageousness required for an IIED claim). Therefore, McPhail's ability to state a claim for IIED rests on the court's interpretation of the behavior of defendants taken as a whole. Coordinating to demote an assistant principal is certainly not commendable conduct, but it also does not lead a reasonable person to exclaim, "Outrageous!" See Holley, 2016 WL 4132316, at *3. Further, while Gettier's comments may be viewed as intemperate and accusatory, defendants' refusal to silence him cannot be considered outrageous conduct in the context of this tort. Defendants also told McPhail that she could no longer have her son or husband visit work to sit with her at the end of the day to alleviate her safety concerns, but this restriction on visitors or companions was likely more inconvenient than outrageous. Taken together, it is apparent that the defendants in this case had a number of interactions

with McPhail that were less than friendly, but they do not rise to the level of outrageousness required to state a claim for IIED.[10]

Ultimately, the court grants defendants' motion to dismiss McPhail's claim of intentional infliction of emotional distress against Hudson, McClung, and Brubaker.

### G. Tortious Interference with Business Relationship (Count XIV)

Lastly, McPhail alleges that individual defendants Hudson, Greenway, Nicely, McClung, Hogan, and Brubaker tortiously interfered with McPhail's employment contract, along with her expectancy of advancing as an administrator at RCPS. Defendants move to dismiss this claim because each of the defendants are agents or employees of the School Board, and, as a matter of law, cannot be liable for interfering with a contract involving their principal or employer as a party.

To state a claim for tortious interference, a plaintiff must allege facts to demonstrate "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." Chaves v. Johnson, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985).

"A person cannot intentionally interfere with his own contract." Fox v. Deese, 234 Va. 412, 427, 362 S.E.2d 699, 708 (1987). Furthermore, an agent cannot be liable for tortious

---

[10] The third element requires the plaintiff to demonstrate that the defendants' intentional conduct was causally connected to her emotional distress. See Supervalu, Inc., 276 Va. at 370, 666 S.E.2d at 343. Given that McPhail cannot satisfy the first two elements, an analysis of the third element is unnecessary. But for completeness, it is worth stating that the defendants' conduct does appear to be causally connected to her distress. If her expression had not been suppressed and if she had not been demoted by defendants, McPhail would not be suffering from the alleged anxiety and fear.

interference with a contract to which his principal was a party. Smith v. Purnell, No. 1:11cv922, 2011 WL 6140868, at *7 (E.D. Va. Dec. 9, 2011). As a matter of law, "an employee acting within the scope of his or her employment cannot interfere with a fellow employee's contract." Koontz v. Jording, No. 3:18cv380, 2019 WL 1339595, at *10 (E.D. Va. Mar. 25, 2019) (citing Fox, 234 Va. at 427); see Williams v. Autozone Stores, Inc., No. 3:09cv255, 2009 WL 3837281, at *2 (E.D. Va. Nov. 13, 2009) ("[W]here tortious interference is alleged against an agent of the terminating party, the potential for liability turns on whether the employee was acting outside the scope of his employment at the time the interference took place.").[11]

But "a plaintiff may be able to establish the prima facie elements of tortious interference with a contract against a fellow employee, if the employee acted outside the scope of his or her employment." Koontz, 2019 WL 1339595, at *10; see Harrington v. Sprint Nextel Corp., No. 1:08cv336, 2008 WL 2228524, at *7 (E.D. Va. May 29, 2008) (denying the motion to dismiss because the plaintiffs alleged "action outside the scope of an ordinary Human Resources Manager's duties"). In determining whether an employee is acting within the scope of his or her employment, "the Court examines whether the act: (1) was expressly or impliedly directed by the employer, or is naturally incident to the business and (2) was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest." Koontz, 2019 WL 1339595, at *10 (emphasis in original). In addition, if the conduct arises "wholly from some external, independent, and personal motive on the part of the employee

---

[11] Typically, "the question of whether the defendants were acting within the scope of their employment is an issue that requires an evidentiary hearing." Harrington v. Sprint Nextel Corp., No. 1:08cv336, 2008 WL 2228524, at *7 (E.D. Va. May 29, 2008) (citing Fox, 234 Va. at 427). However, the court may "dismiss the claim without a hearing if the party fails to allege action outside the scope of the ordinary duties of an employee in that position." Id.; see also Calkins v. Pacel Corp., No. 3:07-cv-00025, 2007 WL 2301626, *2 (W.D. Va. Aug. 7, 2007).

to do the act upon his own account," it cannot be said to have occurred within the scope of employment. See Kensington Assocs. v. West, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987) (armed guard's discharge of gun during "horseplay" not within scope of employment); Williams, 2009 WL 3837281, at *2 (supervisor propositioning employee to engage in sexual acts and touching her in an unwanted sexual manner not within scope of employment).

McPhail's complaint broadly states that each individual defendant was "[a]t all relevant times . . . acting within the course and scope of [his/her] employment with Defendant School Board." Compl., ECF No. 1 ¶¶ 8-13. But in Count XIV of the complaint, McPhail alleges that the individual defendants were "acting outside the scope of legitimate interests and driven by discriminatory motives" when they "intentionally interfered" with McPhail's expectation to remain an administrator at RCPS. Id. ¶ 367.

McPhail's allegations that the individual defendants were acting within the scope of their employment in one portion of her complaint do not preclude the court from inferring that they acted outside the scope of their employment in another portion of her complaint. Rule 8(d) states that a "party may make as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d). Because McPhail alleges actions by individual defendants that fall "outside the scope of legitimate interests" and describes actions and statements that were seemingly "driven with discriminatory motives,"[12] McPhail has sufficiently alleged that the individual defendants were not acting within the scope of their employment for purposes

---

[12] McPhail argues in her Opposition Brief that defendants were "motivated by their intense dislike of Ms. McPhail, and their strident anti-LGBTQ+ position, rather than the proper interest of the School Board (which, among other things, includes providing a quality education to those students in the school district, not targeting teachers and administrators with whom the School Board personally disagrees on social and political issues.)" ECF No. 23 at 51.

of the tortious interference claim. While it may be impossible for McPhail to prevail on all of her claims at once, this inconsistency can be resolved at a later stage of the proceedings. See Williams, 2009 WL 3837281, at *2.

The court denies defendants' motion to dismiss McPhail's claim of tortious interference against the individual defendants, with the exception of Nicely, as there are no specific actions alleged to have been taken by him.

## IV.    CONCLUSION

For the foregoing reasons, the court **GRANTS** defendants' motion to dismiss Counts IV, V, VI against the School Board, Count XIII against the individual defendants, and Counts XI and XII against all defendants. The court **DENIES** defendants' motion to dismiss Counts VII, VIII, IX, X and XIV against the individual defendants, with the exception of Nicely. Because the complaint does not allege any specific conduct by Nicely, the court **GRANTS** Nicely's motion to dismiss each count against him.

An appropriate Order will be entered.

Entered: January 22, 2026

Michael F. Urbanski
Senior United States District Judge

41